James R. Harrison (#03057)
Richard L. Green (#03259)
Paul D. Friedman (#012716)
O'Steen & Harrison, PLC
300 W. Clarendon Ave., Suite 300
Phoenix, Arizona, 85013-3424
(602) 252-8888
Attorneys for Plaintiffs

Lynn Seithel (SC Bar No.: 69728
SC District Court No.: 8017)
Motley Rice LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9134
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mayda Nix as the surviving mother of Christopher Nix, Deceased, on behalf of herself and MilleniumChristopher Richard Steven-Nix, through his Guardian Ronnie Mungle, as the surviving child of Christopher Nix, Deceased, <br><br> Plaintiffs, <br><br> vs. <br><br> GlaxoSmithKline PLC, Smith Kline Beecham Corporation d/b/a GlaxoSmithKline et. al. | No. 2:06-CV-00043-PHX-SMM <br><br> **REPLY TO DEFENDANT SMITHKLINE BEECHAM'S OPPOSITION TO PLAINTIFFS' RULE 59(e) MOTION** <br><br><br> **ORAL ARGUMENT REQUESTED** |

Pursuant to this Court's L.R.Civ. 7.2(g) and F.R.Civ.Pr. 59(e) Plaintiffs moved the Court to Alter or Amend the Judgment and Reconsider the Court's Order dated September 5, 2007 granting Summary Judgment and requested that this Honorable Court review its Decision and Order to prevent manifest injustice. The Court graciously requested additional briefing on said motion from both

parties.   At this time in accordance with the Court's order, Plaintiffs reply to Defendant GSK's Response, and respectfully requests the Court's continued patience and understanding in re-considering its prior ruling.   Additionally, Plaintiffs' beseech the Court for oral argument should it automatically not be inclined to grant said motion after considering the Rule 59(e) Motion in order to assist the Court in ruling on this motion and to fully understand all prior proceedings as well as the gravamen of the Court's prior ruling in this matter.[1]

## I.   RECONSIDERATION STANDARD

Plaintiffs' agree with the defense that a motion to reconsider must provide a valid ground for reconsideration by showing two things. First, it must demonstrate some valid reason why the Court should reconsider its prior decision. Second, it must set forth facts or law of a strongly convincing nature to induce the Court to reverse its prior decision.   Nomo Agroindustrial SA DE CV v. Enza Zaden North America, Inc., 2007 WL 1077023 at *1 (D. Ariz. April 9, 2007).   Courts have advanced three major grounds justifying reconsideration: (1) an intervening

---

[1] Unfortunately, this case has a troubled procedural history and only was given recent review by this Court. Counsel for Plaintiffs are concerned that due to the various transfers of the case, Plaintiffs' prior briefing and perceived non-compliance with the Court's local rules, other evidentiary misunderstandings, as well as how certain evidence was presented to the Court, that manifest injustice has occurred. For background, this case was removed to Federal Court on 1/5/06, and it was assigned to the Hon. Mark E. Aspey. On 1/12/06, the case was chosen for assignment to the District Judge Jurisdiction (MAP) and on 1/18/06, it was reassigned to Judge Earl H. Carroll. The case was set for trial August 5, 2007.   Various discovery was completed, motions were filed, and Judge Carroll recused himself on 6/4/07.  The case was then assigned to Judge Roslyn Silver, but on the same date (6/4/07), it was reassigned to Judge David G. Campbell. Thereafter, Judge Campbell set oral arguments for Summary Judgment to be heard on 8/24/07, and assigned a trial date of December 5, 2007.  On 6/19/07, the oral arguments were rescheduled for 8/31/07. On 8/20/07, less than 2 weeks before the oral arguments were to be heard, the case was reassigned to Judge Stephen M. McNamee.  Your Honor thereafter vacated the order setting oral arguments and on 9/5/07 granted Defendant's Motion for Summary Judgment.   Plaintiffs' counsel are extremely sorry for any causal factor in the misunderstandings and prior briefings, and simply request the Court reconsider these matters under the circumstances and law as raised herein and grant Oral Argument if that would assist as well.

change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent **manifest injustice**.  Id. (citing Bahrs v. Hughes Aircraft Co., 795 F.Supp. 965, 967 (D. Ariz.1992)) (emphasis added).  As set forth in Plaintiffs' Motion for Reconsideration and herein, clear manifest injustice has resulted in matters pertinent to the Court's prior decision.

## II.   DR. HOEHNE DOES NOT SATISFY THE INTENT OF THE LEARNED INTERMEDIARY DOCTRINE

As raised in Plaintiff's Rule 59(e) Motion, Dr. Hoehne is incapable of performing a proper risk-benefit analysis as a learned intermediary for a variety of reasons.  Most notably, he lacks a close and personal relationship with Christopher Nix (he only saw him briefly on one occasion), and he has an unquestioned bias towards GSK and Serevent; therefore, his testimony in favor of the defense is not only expected, but clearly not credible as it concerns reliance upon him as the "learned intermediary".  Nonetheless, Dr. Julie Tominaga is a more appropriate learned intermediary and should be applied as such.

### A.   Dr. Hoehne Does Not Have an Adequate Relationship with the Patient to be Learned Intermediary

Defendants first argue that a "personal" or "close" physician-patient relationship is not a factor when determining the learned intermediary.  In contrast, courts have stated, "[a]s a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient." Jones v. 3M Co., 669 P.2d 744, 760 (N.M. App. 1983).  "Since the physician is the

medical expert who stands in an intimate relationship with his patient, he is expected to weigh the risks and benefits of the product against the needs, susceptibilities, and reactions of his patient, and decide on the products used accordingly." Id. at 761.  (citing Davis v. Wyeth Labs., Inc., 399 F.2d 121 (9th Cir. 1968); Dalke v. Upjohn Co., 555 F.2d 245 (9th Cir. 1977)).  Consistent with the aforementioned language, it is unrealistic to assert that Dr. Hoehne could perform proper risk-benefit analysis as a "learned intermediary" when his contact and treatment of Christopher Nix can best be described as miniscule, brief, and unmemorable.

Defendant contests that Dr. Hoehne considers: "patient's individualized medical condition, patient's medical history, family medical history, concomitant drug use and severity of the underlying condition" in preparing his risk-benefit analysis when prescribing a drug (Defendant's Opposition to Plaintiffs' Motion for Reconsideration, p. 6; Court Document Number 156).  Yet, Dr. Hoehne only saw Christopher Nix on one occasion,[2] did not recognize Nix's picture at his deposition,[3] did not know whether he was African American or Caucasian[4] and could not even make out all of his notes regarding Nix[5] on the brief two pages he was able to assemble for his deposition.[6]  Furthermore, Dr. Hoehne did not follow

---

[2] See Deposition of Dr. Hoehne, p. 18-19. (Court Document Number 114, Exhibit I)
[3] Id., at 73.
[4] Id., at 54.
[5] Id., at 27.
[6] Id., at 18-19.

Nix or follow up with his treatment and in fact, had not learned of his premature death until two weeks before his deposition.[7]

Based on the foregoing facts, Dr. Hoehne lacks the intimate relationship to properly weigh a cost-benefit analysis against the needs, susceptibilities, and reactions of Nix. *See* Jones, 669 P.2d at 761. Dr. Hoehne's brief lone consult with Nix does not encompass the close relationship that a justifiable application of the Learned Intermediary Doctrine presupposes. Manifest injustice would result if Dr. Hoehne were deemed the learned intermediary.

### B.        Dr. Hoehne is Improperly Biased in Favor of GSK

Dr. Hoehne is improperly biased in favor of GSK, and therefore his judgment is clouded and the credibility of his testimony is called into question requiring a jury question. In Motus, the court did not find bias on the part of the treating physician, but the opinion states that if there were bias, the issue as to the credibility of the prescribing physician *would be a jury question.*" Motus v. Pfizer, 196 F.Supp. 2d 984, 997 (C.D. Cal. 2001), aff'd 358 F.3d 659 (9th Cir. 2004). As such, Dr. Hoehne is biased and the veracity of his testimony should be examined by a jury.

Defendant's rebuttal that Dr. Hoehne does not share a financially motivated bias is that he prescribes a drug called Qvar[8] more frequently than Serevent and that there is no evidence the Dr. Hoehne owns stock in the company that

---

[7] Id., at 59.
[8] Qvar was not on the market when Dr. Hoehne saw Nix in 1998, and in fact is not a beta 2 agonist in competition with Serevent. Qvar also does not carry a black box warning or the heightened risks of death and asthma exacerbations that Serevent carries in its label today.

manufactures Qvar. This argument is unconvincing and misdirected. Dr. Hoehne justifies his reasoning for prescribing Qvar most frequently because Kaiser (his employer) gets a "*good price on it*". *See* Dr. Hoehne Dep. at 76. In contrast, Serevent is expensive. Id. at 80. This would explain Dr. Hoehne's motives for "forging relationships" with GSK representatives and his acquisition of free samples to give patients. Although it was **against** Kaiser's policy for physicians to engage in contact with drug company representatives, Dr. Hoehne had a natural propensity to do so because of his stock ownership in GSK. It is not surprising that Dr. Hoehne's explanation of GSK's drug representative's willingness to leave free samples was that he was a "nice person." Id. at 104. By obtaining free samples Dr. Hoehne could dispense Serevent to all possible patients and subsequently write prescriptions once the patient's reliance on Serevent was commenced. In doing so, Dr. Hoehne could enhance his portfolio and prevent losses to GSK through his testimony. Manifest injustice would result if Dr. Hoehne's credibility was not queried in the form of a jury question. Should the Court allow or permit, Plaintiffs' counsel will be happy to re-depose Dr. Hoehne who is now represented by counsel that mysteriously appeared at the deposition to fully discover the true nature of his relationship with GSK and its representatives.[9]

### C.       Dr. Tominaga is the Proper Learned Intermediary.

Defendants next argue that Plaintiffs' assertion that Dr. Tominaga "may well

---

[9] Clearly the statute of limitations had expired years prior to the deposition of Dr. Hoehne. Moreover, when Defendant's scheduled the deposition, they mistakenly or purposefully told the doctor that the deposition would only last an hour and no room was available to continue. (See Hoehne, pp 110-111)

have removed Nix from Serevent if she were apprised of risks" still lacks a factual

basis in the requisite "affirmative evidence." Defendant's Opposition to Plaintiffs'

Motion for Reconsideration, at FN1 (citations omitted). However, Dr. Tominaga

does not prescribe Serevent to her patients. *See* Deposition of Dr. Tominaga, p. 67

(Court Document Number 114, Exhibit J). Upon a more thorough examination of

Dr. Tominaga's deposition it is revealed that Plaintiffs' assertion is accurate:

> Q: (Ms. Jekel) Are there safety issues with Serevent that you are concerned
> with now?
> A: (Dr. Tominaga) I have read that there have been some concerns on safety.
> Q: (Ms. Jekel) In your decision-making process today as to whether or not you
> would prescribe Serevent, do those safety concerns weigh into that decision?
> A: (Dr. Tominaga) They make me more cautious of prescribing them.
> Q: (Ms. Jekel) So you would factor those safety concerns into a risk benefit
> analysis?
> A: (Dr. Tominaga) Correct.

Dr. Tominaga Dep., at 68-69.

Based on the considerations Dr. Hoehne uses when applying a proper risk-

benefit analysis: patient's individualized medical condition, patient's medical

history, family medical history, concomitant drug use and severity of the

underlying condition, it is plain to see that Dr. Tominaga would be the proper

learned intermediary. Defendant's Opposition to Plaintiffs' Motion for

Reconsideration, at 6. Dr. Tominaga had a personal and intimate relationship with

Christopher Nix and his mother. Dr. Tominaga had an independent recollection of

Nix without her records;[10] this is the result of treating him for six and a half years.

---

[10] Dr. Tominaga Dep., at 59

She knew Nix had a learning disability,[11] counseled Nix about school issues,[12] and knew Nix's father was an alcoholic who smoked and could be abusive.[13] Dr. Tominaga also had extensive knowledge of Christopher's relationship with his mother,[14] his engagement,[15] and his fiancé's pregnancy.[16] She even helped raise money for Nix's funeral[17] and called Ms. Nix as soon as she found out about Christopher's death.[18]

During the period when Nix used Serevent, he remained under the care of Dr. Tominaga. This is distinguishable from the case in <u>Motus</u> where the patient died six days after his first prescription. 196 F.Supp. 2d at 987. Dr. Tominaga had fifteen months in which to alter Nix's medication regimen, had she been given adequate warnings by GSK. Furthermore, because she does not prescribe Serevent and admits that concerns over the safety of the drug would affect her risk-benefit analysis, Summary Judgment is not proper in the instant case. Manifest injustice would result if Dr. Tominaga were not identified as the learned intermediary.

### III. DR. HOEHNE IS EQUIVOCAL AS TO WHETHER ADDITIONAL WARNINGS WOULD HAVE ALTERED HIS DECISION TO PRESCRIBE SEREVENT.

The <u>Motus</u> Court points out that if a prescribing physician's testimony is "equivocal or uncertain," the court may well "reserve the issue of credibility for

---

[11] <u>Id.</u>, at 108.
[12] <u>Id.</u>
[13] <u>Id.</u>, at 44-45.
[14] <u>Id.</u>, at 60-61.
[15] <u>Id.</u>, at 104.
[16] <u>Id.</u>
[17] <u>Id.</u>
[18] <u>Id.</u>, at 103.

the jury's determination." Id. at 997.  Motus is distinguishable from the instant case in many respects.  In Motus, "Dr. Trosler stated that he did not read the package insert or PDR entry for Zoloft until after Mr. Motus committed suicide.  It follows that the inclusion of adequate warnings in that information would not have affected his decision."  Id. at 996.  In the instant case, Dr. Hoehne did read and relied upon the package insert and PDR entry before prescribing Serevent.  See Dr. Hoehne Dep. at 78, 100-101.  In addition, the physician's testimony in Motus "does not establish that if the warning had been provided, he would not have prescribed Zoloft **or** would have told Mr. Motus something other than what he did say."  Motus, 196 F.Supp. 2d at 997 (emphasis added).  Contrary to this conclusion, Dr. Hoehne did state that he would have informed Christopher Nix of serious risks had he been apprised of the risks associated with Serevent.  See Dr. Hoehne Dep. at 98, 99. [19]

Indeed, the Motus Court stated that the "[p]laintiff also never asked Dr. Trostler whether the warning would have affected what Dr. Trostler said to Mr. Motus at the time he prescribed him Zoloft."  Motus, 196 F.Supp. 2d at 989. Nevertheless, the instant case showcases that Dr. Hoehne stated that his advice to Christopher Nix would have differed had he been aware of the serious risks of Serevent at the time of prescription.  See Dr. Hoehne Dep. at 98, 99.  When asked in deposition whether he would have thought twice before prescribing to Nix if he

---

[19] The deciding question on whether Dr. Hoehne would have altered Nix's medical treatment given adequate warnings was repeatedly shut down by the same attorney that represented both Tominaga and Hoehne. (See Hoehne at 47, See Tominaga at 106.)  This compounds the manifest injustice to the family of Nix.

had known about deaths associated with Serevent, Hoehne responded he would have starting looking into the specifics surrounding the deaths if he had known about **five** deaths associated with Serevent.  (See Hoehne Dep. at 107)  Evidence shows at least **180** deaths occurred in Serevent patients in premarketing![20]

Based on the fact that Dr. Hoehne would have altered his advice to Christopher Nix upon awareness of serious risks associated with Serevent under the <u>Motus</u> standard Summary Judgment is inappropriate.   Furthermore, Dr. Hoehne was equivocal as to whether additional warnings would have altered his decision to prescribe Serevent and therefore, it is a question for a jury.  Manifest injustice would result if Summary Judgment is affirmed.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully request that this court re-consider is Order on Summary Judgment in this matter and deny said motion or in the alternative, permit additional discovery related to the issues raised by this motion.  Oral argument requested.

This 17th day of October, 2007.

---

[20] Medwatch Report, Court Document No. 116, Exh. BB.

Respectfully Submitted,

MOTLEY RICE LLC

By: Lynn Seithel, *pro hac vice*
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9134

*Attorney for Plaintiffs*